UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MICHAEL ZIEPER and MARK WIEGER,

                    Plaintiffs,                    00 Civ. 5594 (PKC)

     -against-

                                       MEMORANDUM
                                          AND
                                      ___ORDER___

JOSEPH METZINGER and LISA KOROLOGOS,
                        Defendants.
-------------------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.

        New Year's Eve has long been celebrated by throngs of revelers in New York City's Times Square, and it was widely anticipated that the arrival of the year 2000 would attract greater than usual attention and participation. The New York City Police Department ("NYPD"), the Federal Bureau of Investigation ("FBI") and the Office of the United States Attorney for the Southern District of New York ("USAO-SDNY") coordinated anti-terrorism activities in advance of the December 31, 1999 celebration.

        In October 1999, a video approximately six minutes in duration appeared on an Internet website. In the video, an unidentified and unseen male whose voice is heard appears to pan a camera across locations in or about Times Square, occasionally zooming in on specific spots. The male voice states: "This is where it all goes down." He describes what he says will be the setup of Times Square on New Years Eve, including the location of "containment pens and [] barricades" and "civilian authorities." He instructs "Alpha Team" to "keep throwing out your story to any of the Caucasians near-by. Hit them on that black thing . . .'Tonight we're gonna get some for ourselves' . . . Stir that shit up." He tells "Bravo

Team" to have people "running for their lives" by midnight. He instructs "Raven" to "agitate it" by "giv[ing] them a little of that Amadou shit," by which time he predicts "[t]here's gonna be a lot of hot lead flying every which way, all around here. . . ." The voice describes how at midnight "[t]he lights go out and it's gonna be pretty fucking dramatic," and tells his "guys" to have a "withdrawal plan in your head" because "I don't want anybody left on the island when the troops start moving in . . . . Once they secure the perimeter, nothing and nobody is gonna get off this island." The voice concludes by telling his "teams" that "[t]he situation gets crazy enough, civilian authorities are gonna have no other choice but to call on our boys to fix it."

The video raised security concerns regarding the upcoming Millennium celebrations in Times Square. Law enforcement personnel learned that the video was the creation of plaintiff Michael Zieper, a filmmaker who posted it on the crowdedtheater.com website. The website was hosted by BECamation, whose owner, plaintiff Mark Wieger, provided space for the website on a server and was responsible for the technical creation of the site. As discussed herein, after receiving instructions from other law enforcement personnel, defendant Joseph Metzinger, a Special Agent with the FBI, asked Zieper to remove the video from the Internet. Zieper refused. Metzinger and defendant Lisa Korologos, an Assistant United States Attorney in the Southern District of New York, then asked Wieger to remove the video. Wieger agreed, and blocked Internet access to the video for approximately ten days.

Plaintiffs subsequently brought this action against defendants Metzinger, Korologos and others, alleging that they threatened or coerced plaintiffs into removing the video in violation of plaintiffs' rights under the First and Fifth Amendments. Plaintiffs bring their claim pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Nar-</u>

cotics, 403 U.S. 388 (1971), seeking monetary relief from Metzinger and Korologos in their individual capacities.

Defendants now move for summary judgment asserting that there is no genuine issue of material fact as to liability under the First Amendment and, alternatively, that defendants are entitled to summary judgment on qualified immunity grounds. For the reasons set forth below, defendants' motions for summary judgment on plaintiffs' First Amendment claims are denied, but are granted on the issue of qualified immunity. Plaintiffs' Fifth Amendment claims depend upon the viability of their First Amendment claims in this case and are dismissed on the ground of qualified immunity.

I.     PROCEDURAL HISTORY

This lawsuit was commenced on or about December 22, 1999 in the District of New Jersey against then-United States Attorney General Janet Reno, then-Director of the FBI Louis Freeh, then-United States Attorney for the Southern District of New York Mary Jo White, Metzinger and Korologos.[1] Judge Dickinson R. Debevoise of the District of New Jersey granted a motion to dismiss as to all official capacity claims for declaratory and injunctive relief because plaintiffs had failed to allege an immediate threat of future harm. This left only the individual capacity claims against defendants Metzinger and Korologos, as to which Judge Debevoise found the plaintiffs had stated a claim. Zieper v. Reno, 111 F. Supp. 2d 484 (D.N.J. 2000). Judge Debevoise transferred the case to this District, where there was personal jurisdiction over the two individual defendants and which he concluded was a more convenient forum for the parties and witnesses. Id. at 492.

---

[1] The caption in this action is amended to reflect the dismissal of all defendants other than Metzinger and Korologos.

In this District, the case was assigned to Judge Richard Berman. Defendants Metzinger and Korologos moved to dismiss the Complaint on the ground that a First Amendment claim was not stated, and on the doctrine of qualified immunity. In a decision and order dated June 26, 2002, Judge Berman ruled that plaintiffs adequately pleaded a claim for relief under the First Amendment and that "[d]iscovery is needed in this case to determine . . . whether Defendants' conduct was coercive and/or intimidating; whether Defendants' comments were legal advice or appropriate request(s) for help; and, whether it was reasonable for Plaintiffs to fear prosecution/government action as a result of noncompliance." Zieper v. Reno, 2002 WL 1380003, at *5 (S.D.N.Y. 2002). Judge Berman also ruled that the question of whether defendants were entitled to qualified immunity "requires an evaluation (discovery) of (several) issues of fact, including, among others: the nature of Defendants' communications to Plaintiffs, the circumstances surrounding Defendants' actions, including the impending millennium; whether such actions were an appropriate and/or proportional response to issues and concerns of public safety; and, the circumstances surrounding the airing of the film." Id. at *8. Defendants Metzinger and Korologos appealed to the Second Circuit arguing that the district court erred in not granting their motion to dismiss. In an unpublished summary order, the Court "conclude[d] that the complaint does allege a constitutional claim . . . ." Zieper v. Metzinger, 62 Fed. Appx. 383, 386 (2d Cir. 2003). It also ruled that it did not have jurisdiction to review the district court's conclusion that "discovery is necessary in order to resolve factual issues related to defendants' qualified immunity defense . . . ." Id.

The case was reassigned to me and discovery ensued. On April 28, 2004, I set a fact discovery closure date of September 10, 2004. Thereafter, at the joint request of the parties, I extended the date to September 23. On September 24, I set a schedule on the now pend-

ing summary judgment motions. I heard oral argument on the fully briefed summary judgment motions on July 21, 2005.

## II. THE FACTUAL RECORD ON THE SUMMARY JUDGMENT MOTIONS

As the summary judgment movants, each defendant submitted a Statement of Undisputed Facts pursuant to Local Rule 56.1. The plaintiffs responded to those statements. In many material respects, the facts are undisputed. In instances where plaintiffs have disputed a stated fact, I accept only their version of events. Where multiple inferences could be drawn from the same facts, in each case I draw the inference most favorable to the plaintiffs.

### A. The Video

Zieper's video includes no actors or action, but rather consists simply of the narrator and what appears to be daytime street footage at various locations in Times Square. As described by plaintiffs, "[t]he plan [depicted in the film] included the use of violence, including a staged sexual assault." (Pls. Metzinger 56.1 Resp. ¶ 4)

Zieper, who titled his video "Military Takeover of New York City," states that he intended the work to comment on "the paranoia that was gripping this country surrounding the end of the Millennium, and how racial hatred is used to manipulate people." (Pls. Metzinger 56.1 Resp. Add'l Facts ¶ 6) He produced the video in an intentionally ambiguous and amateurish fashion in order to convey a sense of realism. (Zieper Decl. ¶ 6; Zieper Dep. at 57-58; Complaint ¶¶ 15-16) The video "purports to depict real events" and "purposefully avoids the use of framing devices employed in conventional films that signal to the viewer that the events are fictional." (Pls. Metzinger 56.1 Resp. ¶ 3; Complaint ¶¶ 15-16) Zieper's name did not appear anywhere on the website or the film, neither of which indicated who created the tape or whether it purported to be a work of fiction. According to Zieper, this was

intentional and is typical of his films, which "frequently do not include credits or titles or other markers that would indicate they are fiction . . . in order to provoke additional thought on behalf of the viewer" "in the tradition of <u>War of the Worlds</u>." (Zieper Declaration ¶ 6) Zieper "followed this tradition in the 'Military Takeover' film," and made it available on the Internet "so that it could be viewed by millions of people." (<u>Id</u>. ¶¶ 6 & 7) He "called the web site 'crowdedtheater.com' and chose as [his] contact email address 'fire@crowdedtheater.com' to invoke Justice Holmes' famous comment in <u>Schenck v. U.S.</u>, 249 U.S. 47 (1919)." (<u>Id</u>. ¶ 8) In addition to posting the film on his website, Zieper also posted information about the film on Internet newsgroups to call people's attention to it. (<u>Id</u>. ¶ 7) In one of those postings, Zieper (using his internet address) wrote "My cousin gave me this tape. The tape looks like it could be real. I put it on my website. see [sic] what you think." (Fine Decl. Exh. X)

Zieper's video was accompanied by a statement on the website's home page that read:

> Is there going to be a Military Takeover of New York City on New Years Eve 1999? I don't know too much about this tape you are about to see. I got it from my cousin Steve who's in the army. He said that copies of this tape are floating around the base, and nobody knows who made it. If it's fake, then there's nothing to worry about. If it's real, then we're in really big trouble. (Complaint ¶ 19)

According to Zieper, this statement was intended to foster ambiguity about the tape and its origin. (Pls. Metzinger 56.1 Resp. ¶ 9; Zieper Dep. at 57-58)

B.   <u>Defendants' Contact with Zieper</u>

In early November 1999, Zieper's film came to the attention of the NYPD, FBI and USAO-SDNY. After viewing the tape, the then-co-chief of the USAO-SDNY's Organ-

ized Crime and Terrorism Unit, Patrick Fitzgerald, advised the FBI Assistant Special Agent in Charge of the Counterterrorism Branch of the FBI's New York office, Pasquale D'Amuro, that although the government could not order anyone to remove the film from the Internet, the government could ask or request that the tape be removed. D'Amuro, in turn, informed defendant Special Agent Metzinger or his supervisor that they could request that the film be taken off the Internet. (Pls. Metzinger 56.1 Resp. ¶¶ 10-16)

On November 10, Defendant Metzinger, along with two NYPD detectives, including Detective Daniel Calemine, and a local police officer, went to Zieper's New Jersey home to speak with him. Zieper was not at home. Metzinger asked the local police officer to call Zieper at a pager number. When Zieper returned the page, the police officer told him that he was at his doorstep with two FBI agents, who wanted to speak with him. Zieper informed him that he would not be returning that evening, and the call ended. Metzinger then paged Zieper, and when Zieper returned the call, Metzinger told him that he was a special agent with the FBI and was at Zieper's home with Detective Calemine, and that they were trying to find out about the video. According to Zieper, Metzinger told him to "imagine the consternation the film was causing New York," expressed his displeasure with the site, "and said the film might 'upset' all the people coming to New York and that it would have a 'negative impact on people's plans and the business interest.'" (Pls. Metzinger 56.1 Resp. Add'l Facts ¶¶ 18-24)

Metzinger asked Zieper where he had obtained the video. (Id.) Zieper told Metzinger that he would speak to him the following day, and Metzinger agreed, asking if "in the meantime there was any way the FBI could get people to stop seeing the video on the Internet." (Complaint ¶ 26; Pls. Metzinger 56.1 Resp. Add'l Facts ¶ 26) According to Zieper, Metzinger "asked me to help him come up with a way to prevent people from seeing my web-

site." (Zieper Dep. at 46) When, according to Zieper, Metzinger asked him if he could call a local TV station that was scheduled to feature a portion of the video and ask them not to run the story, Zieper responded "at that time [I] couldn't make that call, but perhaps he would want to." (Zieper Dep. at 170; Pls. Metzinger 56.1 Resp. Add'l Facts ¶ 28) Neither Metzinger nor Zieper asked the local TV station to refrain from broadcasting a portion of the video. Zieper testified that during the November 10 phone calls, "no one told me I had to do something" or would be prosecuted if he did not do something, Metzinger was "polite," and the tone of the conversation was not threatening. (Zieper Dep. at 11, 45-46; Pls. Metzinger 56.1 Resp. ¶¶ 24 & 27)

Although Metzinger left a message for Zieper the next day asking him to call, Zieper did not return the call, and never spoke to Metzinger again. Instead, lawyers for Zieper called Metzinger, informed him that the video was a work of fiction, and asked that all contact with Zieper be through his lawyers. One of Zieper's lawyers, Scott Thompson, said to Metzinger "I hope we cleared this up for you . . . . [and] if there's any further action you need that needs to be taken, . . . go through us, but I hope it's over." (Thompson Dep. at 31) According to Thompson, Metzinger responded with "words to th[e] effect" that "this isn't over." (Id.) Thompson also testified that although he hoped that the FBI would end its investigation after speaking to him, it "would be contrary to my 20 years of experience with the FBI" if Metzinger had simply said "'the lawyer said there's no problem so I'm just going to walk away.'" (Id. at 31-33) During the phone call with Thompson, Metzinger also informed him that FBI agents were on their way to Zieper's house and could not be stopped. (Skolnick Dep. at 31; Pls. Metzinger 56.1 Resp. ¶¶ 33-35) It is undisputed, however, that Metzinger in fact told the agents not to contact Zieper again and neither Metzinger nor the FBI had any further contact

with Zieper or his lawyers. (Pls. Metzinger 56.1 Resp. ¶¶ 33-35) Zieper did not remove the video from his website. (Pls. Metzinger 56.1 Resp. ¶ 34; Zieper Dep. at 173) It also is undisputed that defendant Korologos had no contact with Zieper. (Zieper Dep. at 11)

C.     Defendants' Contact with Wieger

On November 12, Metzinger and Detective Calemine brought a copy of the video to the United State Attorney's Office for the Southern District of New York and met with AUSA Korologos and AUSA Michael Garcia, who was then the Acting Chief of the USAO-SDNY's Organized Crime and Terrorism Unit. (Pls. Metzinger 56.1 Resp. ¶¶ 37-38) Then-U.S. Attorney Mary Jo White also participated in discussions about the tape, having first heard about the tape from Fitzgerald. (White Dep. at 3) Garcia informed White that they were planning to contact the website host of the video "to request that while they continued to investigate, that the tape not be shown." (Id. at 4-5; see also Pls. Korologos 56.1 Resp. ¶ 13) After viewing the tape, White informed Garcia that "this should be a request and that the [FBI] should do it as part of what I call, its good corporate citizenship program, where they, in various contexts, request of citizens to do various things." (Id. at 5; Pls. Korologos 56.1 Resp. ¶ 14) Korologos understood that her supervisors, including White and Fitzgerald, had approved of contacting the website host, Wieger, to request that he block access to Zieper's film. (Korologos Dep. at 68-69; Pls. Korologos 56.1 Resp. ¶ 15)

On November 15, 1999, Metzinger and Korologos made a conference call to plaintiff Wieger. They asked him if he owned the website hosting the film, and when he informed them that he did not, they explained who they were and said they were concerned about the film. (Wieger Dep. at 64-65) They informed Wieger that they had already spoken to Zieper and his lawyers, and that Zieper had declined to take down the website when asked

to do so.  According to Wieger, defendant Korologos asked him if he was capable of blocking access to the website, and that he responded "Yes.  Is that what you would like me to do?" (Id. at 69)  When Korologos responded "Yes," Wieger blocked access to the website while still on the phone with defendants.  (Id. at 70)  Wieger later remembered that in the course of his conversation, one of the defendants told him "We've contacted your upstream provider, GTE.  And if you don't pull the site down, they will."  (Id. at 157; see also id. at 146-49)  He testified that he believed that if defendants contacted GTE and asked them to block access to the website, his business would be adversely affected.  (Id. at 149-56)

Later the same day, Wieger called the telephone number given to him by Ms. Korologos and spoke to her once more, asking her "if I had done what she had requested." (Wieger Dep. at 142)  When Wieger told Ms. Korologos that people could still see the content of the website under certain circumstances if they had some computer skills, Ms. Korologos asked, "How can we get people to stop seeing this altogether?"  (Id. at 72-73)  Wieger told her that he could remove all the files and asked if she would like him to do that.  When she responded "Yes," he did so.  (Id.)  Wieger had no further contact with either defendant.

After Wieger blocked access to Zieper's website, articles appeared in the Village Voice and other publications criticizing Wieger's actions in blocking access to Zieper's website.  (Complaint ¶ 45)  Wieger subsequently received harassing phone calls and e-mails from Internet users angry about his decision to block access to Zieper's film, and Wieger in turn sent e-mails to Zieper threatening to sue him for slander.  (Complaint ¶¶ 46-51; Wieger Dep. at 98)  Within a day or two of his conversations with defendants, Wieger contacted the company from which he leased Internet service, On-Line Marketing ("OLM"), to determine whether he could restore access to the website, and was told that he could.  (Wieger Dep. at

78)  On November 25, Wieger sent an e-mail to Zieper stating, among other things, "We feel that Mr. Zieper used us as scapegoats in his attempt at immediate fame . . . Now our business is being attacked from many people who have only read Mr. Zieper's distorted version of what went on."  (Id. at 132-34)  On November 26, Wieger restored access to the website. (Pls. Metzinger 56.1 Resp. ¶ 46)

III.     SUMMARY JUDGMENT PRINCIPLES

On their motions for summary judgment, defendants Metzinger and Korologos argue that to establish liability on their part there must be evidence that they used threats or coercion to suppress protected speech. They further argue that there are no triable issues of fact as to whether they used such threats or coercion.  Next, they argue that even if there is a triable issue of fact on the question of whether they used threats or coercion, their conduct is entitled to protection under the doctrine of qualified immunity.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c).  In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reason-able trier of fact could find in favor of the nonmoving party."  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation and quotation marks omitted); accord Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  However, when the moving party has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial,"

and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e).

It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Thus, in order to survive summary judgment, plain-tiffs must come forth with more than a mere scintilla of evidence in support of their position; they must come forward with evidence "on which the jury could reasonably find for the plain-tiff." Id. at 252. "If, with respect to a material fact as to which the moving party contends there is no dispute, there is evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper." Rattner v. Net-burn, 930 F.2d 204, 209 (2d Cir. 1991) (citing Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988)). In the absence of any genuine dispute over a material fact, summary judgment is appropriate.

IV.     PLAINTIFFS' FIRST AMENDMENT CLAIMS

"To recover on a first amendment claim . . ., a plaintiff must demonstrate that

his conduct is deserving of first amendment protection and that the defendants' conduct of

harassment was motivated by or substantially caused by his exercise of free speech." <u>Dona-</u>

<u>hue v. Windsor Locks Board of Fire Commissioners</u>, 834 F.2d 54, 58 (2d Cir. 1987) (quoted

in <u>Rattner</u>, 930 F.2d at 208).  Defendants do not dispute that Zieper's video is entitled to First

Amendment protection.  The video can be seen as provoking thought.  It is not a call to immi-

nent riotous actions.  It is Zieper's artistic expression and social commentary, and as such, is

protected speech.  To a reasonable person viewing the video for this first time, it may suggest

that someone had planned to undertake activities that are unlawful.  That circumstance, in iso-

lation, does not strip the video of its protection as speech.[2]  It also does not deprive law en-

forcement officers of their ability to investigate further.[3]

"Where the use of coercive power is threatened, First Amendment rights may

be violated by the chilling effect of governmental action that falls short of a direct prohibition

against speech.  The exercise of First Amendment freedoms may be deterred almost as

potently by the threat of sanctions as by their actual application." <u>Aebisher v. Ryan</u>, 622 F.2d

---

[2]     "The First Amendment guarantees all persons freedom to express their views.  The scope of permitted ex-
pression is broad; 'insults that contain neither threats of coercion that intimidate nor fighting words that cre-
ate the possibility of imminent violence must be tolerated." <u>X-Men Security, Inc. v. Pataki</u>, 196 F.3d 56,
68-69 (2d Cir. 1999) (internal citation omitted).  "Constitutional protection does not turn upon 'the truth,
popularity, or social utility of the ideas and beliefs which are offered.'  For 'erroneous statement is inevita-
ble in free debate, and . . . must be protected if the freedoms of expression are to have the 'breathing space'
that they 'need . . . to survive.'" <u>Id.</u> at 69 (quoting <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 271-72
(1964) (other citations omitted)).  "Speech is often provocative and challenging. . . . [But it] is nevertheless
protected against censorship or punishment, unless shown likely to produce a clear and present danger of a
serious substantive evil that rises far above public inconvenience, annoyance, or unrest." <u>Terminiello v.
Chicago</u>, 337 U.S. 1, 4 (1949).

[3]     I note Judge Posner's dictum in <u>Alliance to End Repression v. Chicago</u>, 742 F.2d 1007, 1015-16 (7th Cir.
1984): "[T]he FBI would not be violating the First Amendment itself . . . if it decided to investigate a threat
that was not so immediate as to permit punitive measures against the utterer.  Since the repressive effect of
an investigation is less than that of a prosecution but the benefits in preventing violent crime may be as
great, a less immediate danger will justify the government's action."

651, 655 (2d Cir. 1980) (citations omitted) (ruling that "[i]f the facts as found indicate that the letters and Ryan's comments have a chilling effect sufficient to trigger First Amendment inquiry" the district court could then determine whether liability was established); see also Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963). Only when a government official attempts to coerce, rather than convince, does a First Amendment violation occurs. Okwedy v. Molinari, 333 F.3d 339, 344 (2d Cir. 2003). The test is objective: whether the official's comments "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request" to cease engaging in protected speech. Rattner, 930 F.2d at 208 (citing Hammerhead Enterprises, Inc. v. Brezenoff, 707 F.2d 33, 39 (2d Cir.), cert. denied, 464 U.S. 892 (1983)).

In Bantam Books, the Rhode Island Commission sent notices to book distributors stating that it was charged by the legislature with "prevent[ing] the sale, distribution or display of indecent and obscene publications" and that lists of "objectionable" publications were being circulated to Chiefs of Police with the order that "they are not to be sold, distributed or displayed to youths under the eighteen years of age." 372 U.S. at 63 n.5. The notices also informed the distributors that "[t]he Attorney General will act for us in case of non-compliance," and were followed by a police visit to the distributors. Id. The Supreme Court found that the notices were "phrased virtually as orders," and that the distributors faced a genuine threat of prosecution. Id. at 68. The Court therefore held that the Commission's notices and related enforcement scheme amount to an impermissible prior restraint on publication that "provide[d] no safeguards whatever against the suppression of . . . constitutionally protected[] matter." 372 U.S. at 70. The Supreme Court has also made clear, however, that government officials "may cajole and exhort" without violating the First Amendment. Gravel

v. United States, 408 U.S. 606, 625 (1972); see also Bond v. Floyd, 385 U.S. 116, 135-36

(1966); X-Men, 196 F.3d. at 70 ("[W]e have noted that where a public official, without

engaging in any threat, coercion, or intimidation, 'exhorted' private entities not to distribute a

board game whose ideas the official viewed as pernicious, the official's speech did not violate

any constitutional right of the game's authors.") (quoting Hammerhead, 707 F.2d at 39 &

n.6).

The question to be answered on defendants' summary judgment motion is

whether "the record, taken in the light most favorable to [plaintiffs], reveals statements by

[defendants] that a reasonable factfinder could find, . . . 'intimat[e] that some form of punish-

ment or adverse regulatory action w[ould] follow' if the [plaintiffs] continued to air [Zieper's]

views." Rattner, 930 F.2d at 209-10 (citation omitted).

A.    Defendant Metzinger's November 10, 1999 Conversation with Zieper

In support of their motion, defendants have submitted evidence that after being

told by his supervisors that he could legally request that Zieper remove the film from the

Internet, Metzinger, in a polite, non-threatening tone and without ordering Zieper to do any-

thing, asked Zieper about the film and asked him if "there was anyway the FBI could get peo-

ple to stop seeing the video on the Internet." Defendants have also submitted evidence that

Zieper declined to remove the film in response to this request. These facts, set forth in defen-

dants' Rule 56.1 Statement, are not disputed by plaintiffs. (Pls. Metzinger 56.1 Resp. ¶¶ 15-

16, 21, 24, 34)

As an initial matter, the Court must address defendants' argument that any

claim based on the November 10 conversation with Zieper is doomed because it is undisputed

that Zieper did not remove his film in response to defendant Metzinger's requests.  (Defs. Mem. at 27-28 (citing Curley v. Village of Suffern, 268 F.3d 65 (2d Cir. 2001))).  Indeed, Zieper has stated affirmatively that his speech was not chilled in any way.  Zieper v. Reno, 111 F. Supp. 2d 484, 489 (D.N.J. 2000) (quoting Zieper's declaration that "I intend to engage in similarly provocative and controversial films in the future.").

In Curley, the Second Circuit stated that "[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."  268 F.3d at 73; see also Singer v. Fulton County Sheriff, 63 F.3d 110, 120 (2d Cir. 1995) (plaintiff could not prove that his First Amendment rights had been chilled by government criticism when he continued to publish his newspaper after the criticism), cert. denied, 517 U.S. 1189 (1996).  In Curley, however, the issue was whether defendants had retaliated against plaintiff for the exercise of his First Amendment rights.  Accordingly, the Second Circuit required the plaintiff to prove "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." Curley, 268 F.3d at 73.  The Court held that "with respect to the third element, [plaintiffs must show] that [their] First Amendment rights were 'actually chilled.'"  Curley, 268 F.3d at 73 (quoting Davis v. Village Park II Realty Co., 578 F.2d 461, 464 (2d Cir. 1978)).

Defendants have not demonstrated that the test applied in Curley and other First Amendment retaliation cases is the appropriate test in this case.  The Second Circuit in Rattner noted that the communication at issue had "caused the Chamber to cease publication of the *Gazette*"—that is, chilled speech; but nothing in Rattner suggests that plaintiff would

not have been able to recover based on his other injuries, such as lost business, that were suffered prior to the cessation of the <u>Gazette</u>. <u>Id</u>.[4]

The Third Circuit has observed that those who withstand government efforts to coerce ought not be deprived of a claim if they have otherwise suffered injury. <u>Trotman v. Board of Trustees of Lincoln University</u>, 635 F.2d 216, 227-28 (3d Cir. 1980) (but finding that "defendants' actions were far from ineffective" in chilling plaintiffs' speech and remanding "[s]ince evidence of chill would be relevant to plaintiffs' claim that defendants' activities did in fact result in an unconstitutional restraint on protected speech and conduct"), <u>cert</u>. <u>denied</u>, 451 U.S. 986 (1981).[5] It cautioned against adopting a standard that would limit

> "the protection of the First Amendment to those who are timid but eliminate it for those who are brave. It would indeed be ironic were we to hold that persons who are persevering and resolute, who overcome their inhibitions and fears to proceed on a course they believe constitutionally protected, would thereby lose the very protection which they rely on in asserting their rights . . . ." <u>Id</u>.

Based upon my reading of <u>Rattner</u> and the reasoning of the Third Circuit in <u>Trotman</u>, I decline to rule that the mere fact that Zieper did not remove his film precludes his claim.

In order to survive summary judgment, however, Zieper must demonstrate that there is a genuine issue of material fact as to whether a reasonable person would feel coerced

---

[4] The Court notes, however, that it has found no case in which a First Amendment claim went forward in the absence of allegations or evidence that speech was actually chilled. <u>Cf</u>. <u>Davis v. Village Park II Realty Co.</u>, 578 F.2d at 464 (directing the district court to consider "five important issues" including whether plaintiff "prove[s] that she was actually chilled in the exercise of her [First Amendment rights.])

[5] <u>But</u> <u>see</u> <u>Aiello v. City of Wilmington</u>, 623 F.2d 845, 857-58 (3d Cir. 1980) ("In the case before us we are faced not with a silent record but with a record of conduct, admitted by Aiello, which directly contradicts his charges of a chilling effect. . . . His own recital in the deposition of his activities . . . is undisputed and directly undermines the allegations in his pleadings of a chilling effect. Thus, we agree with the district court that there was no genuine issue of material fact and that the defendants were entitled to prevail as a matter of law."); <u>Penthouse Int'l, Ltd. v. Meese</u>, 939 F.2d 1011, 1016 (D.C. Cir. 1991) ("Whenever a government official criticizes a publication it might be thought that he or she implicitly appeals to the public not to buy, or distributors not to sell, that publication. And if the distributor refuses the appeal and the government official criticizes the distributor for its refusal, it is hard to understand how, and why, that criticism can be banned."), <u>cert</u>. <u>denied</u>, 503 U.S. 950 (1992).

by his contact with Metzinger.  The undisputed facts are that the only statements to Zieper upon which Zieper bases his claim of coercion are that (1) Metzinger told him that he was a special agent with the FBI and was at Zieper's home with Detective Calemine, and that they were trying to find out about the film; (2) Metzinger told Zieper to "imagine the consternation the film was causing New York," expressed his displeasure with the site, "and said the film might 'upset' all the people coming to New York and that it would have a 'negative impact on people's plans and the business interest'" (Pls. Metzinger 56.1 Resp. Add'l Fact ¶ 24); (3) Metzinger agreed to speak to Zieper the next day, asking if "in the meantime there was any way the FBI could get people to stop seeing the video on the Internet" (Complaint ¶ 26; Pls. Metzinger 56.1 Resp. Add'l Facts ¶ 26; Zieper Dep. at 46); and (4) Metzinger asked Zieper if he would call a local TV station that was scheduled to show the film and ask them not to run the story, to which Zieper responded that "at that time [I] couldn't make that call, but perhaps he would want to" (Pls. Metzinger 56.1 Resp. Add'l Facts ¶ 28; Zieper Dep. at 170).  Zieper points to the fact that three law enforcement officers went to his home during the dinner hour—he was not home—and then contacted him by telephone, and asserts that he was left "terrified" by the experience.  (Pls. Metzinger 56.1 Resp. Add'l Facts ¶¶ 22-26)[6]  Plaintiffs also submit evidence (undisputed on this motion) that the next day, lawyers for Zieper called Metzinger, who, told them that FBI agents were on their way to Zieper's home again and could not be contacted, and, when asked if the investigation would continue, told them it would.  (Pls. Metzinger 56.1 Resp. Add'l Facts ¶ 33; Thompson Dep. at 31)  Plaintiffs agree

---

[6]    Zieper also points to evidence that certain law enforcement personnel were in uniform and armed, and arrived in a patrol car, and that GTE was subpoenaed to obtain information about the owner of the crowd-edtheater.com domain name.  See, e.g., Pls. Metzinger 56.1 Resp. Add'l Facts ¶¶ 11, 18-21.  There is no evidence that any of these facts, assuming them to be true, were communicated to Zieper or otherwise known to him.  Facts not known to plaintiffs can have no bearing on whether it was objectively reasonable for plaintiffs to feel coerced or threatened by anything defendants said or did.

that Metzinger did not tell Zieper he "had to do something" or would be prosecuted if he did not do something, that Metzinger was "polite," and the tone of the conversation was not threatening.  (Zieper Dep. at 45-46; Pls. Metzinger 56.1 Resp. ¶¶ 24, 27)

   In contrast to such cases relied upon by plaintiffs as <u>Bantam Books</u>, <u>In re Grand Jury Proceedings</u>, and <u>Center for Democracy & Technology</u>, nothing in Metzinger's words to Zieper refer to criminal statutes or legal consequences, or mirror the language of a criminal violation.  In <u>In re Grand Jury Proceedings</u>, for example, the U.S. Attorney's letter found to be arguably coercive informed its recipient "that a particular course of action could '<u>impede</u>' a criminal investigation 'and, thereby, <u>interfere with the enforcement</u> of the federal criminal laws."  814 F.2d 61, 70 (1st Cir. 1987) (emphasis added).  The First Circuit has noted that language purporting to appeal to a plaintiff's "discretion" may in fact "portray[] an action in terms substantially identical to those used to describe a very serious federal crime."  814 F.2d at 70.  The same is true of those cases relied upon by plaintiffs in which a plaintiff or other party was informed that a government agent believed they were selling or distributing something as "indecent" or "obscene"—such words would have clear legal implications to a reasonable listener.  <u>See</u>, <u>e.g.</u>, <u>Bantam Books</u>, 372 U.S. at 63, 67-72 (notices to book distributors stated that defendants were responsible for "prevent[ing] the sale, distribution or display of indecent and obscene publications"); <u>Penthouse Int'l, Ltd. v. McAuliffe</u>, 610 F.2d 1353 (5th Cir.1980); <u>Center for Democracy & Technology v. Pappert</u>, 337 F. Supp. 2d 606, 660 (E.D. Pa. 2004) (when informal notices were issued to internet service providers (ISPs) using the word "should" when requesting that the ISPs disable access to alleged pornographic material, a reasonable person would feel coerced because the notices made clear that defendants could force the ISPs to comply by court order); <u>ACLU v. City of Pittsburgh</u>, 586 F. Supp. 417

(W.D. Pa. 1984). In both <u>Penthouse v. McAuliffe</u> and <u>City of Pittsburgh</u>, government offi-
cials engaged in patterns of harassment, including warrantless arrests and threats of prosecu-
tion, in an attempt to stop local sales of allegedly obscene magazines. In each case, the court
determined that the harassing conduct resulted in a constructive seizure that ran afoul of the
Constitution by creating a prior restraint on speech in violation of the First and Fourteenth
Amendments. <u>Penthouse v. McAuliffe</u>, 610 F.2d at 1361-1362 ("numerous and harassing ar-
rests prior to a final adjudication upon the issue of obscenity <u>vel</u> <u>non</u> subjected the . . . maga-
zines in question to an informal system of prior restraint . . . ."); <u>City of Pittsburgh</u>, 586
F.Supp. at 422, 427 (the "threatened 'massive sweep' and 'initiation of criminal proceedings'
against vendors of Hustler magazine, prior to a judicial determination that the . . . magazine
was in fact obscene . . . amounts to an unconstitutional abuse of power . . . .").

There is no similar language in anything Metzinger said to Zieper that could
lead a reasonable jury to conclude that a reasonable person would feel subject to arrest, prose-
cution or other punishment. Although Zieper asserts that "the clear implication of what
[Metzinger] told Zieper was that Zieper had done something wrong and illegal, and that they
were going to arrest him" (Pls. Metzinger 56.1 Resp. ¶¶ 24-29), characterization and conclu-
sory description do not create a triable issue of fact. <u>Patterson v. County of Oneida</u>, 375 F.3d
206, 219 (2d Cir. 2004) (opposing party may not create a genuine issue of fact "merely by the
presentation of assertions that are conclusory"); <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 74
(2d Cir. 2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual asser-
tions that are otherwise unsupported in the record. Where . . . the record does not support the
assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the re-
cord reviewed independently."). Zieper does not point to any specific words that gave him

this "clear implication," and admits that "Metzinger spoke in a tone that was facially polite and non-threatening." (Pls. Metzinger 56.1 Resp. ¶¶ 24-29) The testimony of Zieper's own lawyer underscores Zieper's reliance not on Metzinger's words, but his status as an FBI agent, as threatening. (See Thompson Dep. at 23 (testifying that Zieper told Thompson he feared arrest because the FBI was at his house, and that this fear seemed "very real to [Zieper] but I couldn't figure out from my perspective . . . exactly what the basis would be.").) Zieper's own subjective feelings of "terror," are not enough to create a genuine issue of material fact as to whether Metzinger's statements were objectively threatening. See, e.g., Penthouse v. Meese, 939 F.2d at 1015 ("[A]ny misapprehensions of recipients notwithstanding—we do not believe that the Commission ever threatened to use the coercive power of the state against recipients of the letter and . . . [t]he Supreme Court has never found a government abridgment of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction."); id. at 1017 (finding officials entitled to qualified immunity where "it cannot reasonably be said that appellant had a clearly established constitutional right to be free of such deliberate and calculated pressure if no threats of legal sanctions were employed") (emphasis in original).

There are important distinctions in the protections afforded by the First and Fourth Amendments.[7] Nevertheless, the Supreme Court's Fourth Amendment cases make clear that the mere fact an individual is a law enforcement officer—even if wearing a badge

---

[7]  See, e.g., Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 63-64 (1989); Maryland v. Macon, 472 U.S. 463, 468 (1985) ("The First Amendment imposes special constraints on searches for and seizures of presumptively protected material, . . . and requires that the Fourth Amendment be applied with 'scrupulous exactitude' in such circumstances."); U.S. v. Moore, 215 F.3d 681, 685 (7th Cir.) ("While at first glance it may seem odd to require more judicial protection for the liberty of one's books than for one's body, the distinction reflects this country's great concern with the chilling effect on protected speech brought on by a government seizure. . . . The seizure of an individual's books implicates both First and Fourth Amendment liberties, for which the Supreme Court has required heightened judicial protection to afford the right to free expression the breathing room it needs to survive."), cert. denied, 531 U.S. 915 (2000).

and carrying a gun—does not make it reasonable to assume that compliance is required with his request to voluntarily answer questions or submit to a search.  See, e.g., United States v. Drayton, 536 U.S. 194, 201, 204-205 (2002).  Nor does a law enforcement officer's request become coercive by virtue of the fact that he does not inform the individual that compliance is voluntary.  Id. at 206-07; Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973) (Court has never ruled "that the Due Process Clause required the prosecution to prove as part of its initial burden that the defendant knew he had a right to refuse to answer the questions that were put" to him by law enforcement officers).

Drawing every reasonable inference in favor of Zieper, there is nothing in his conversation with Metzinger on November 10 or in Metzinger's conversation with Zieper's lawyers that would permit a reasonable jury to find that Metzinger used threats or coercion to chill Zieper's First Amendment rights.

B.     Defendants' November 15, 1999 Conversations with Plaintiff Wieger

Zieper may overcome the First Amendment prong of defendants' motion if he comes forward with some evidence that defendants used threats or coercion to induce Wieger into removing Zieper's film.  See Okwedy, 333 F.3d at 344 (plaintiffs had a claim when the government allegedly coerced the distributor of the plaintiff's billboard messages, although the government had no contact with the plaintiffs).  Wieger also asserts that Metzinger and Korologos violated his civil rights by coercing him into blocking access to the website during two telephone conversations on November 15, and defendants have not challenged his stand-ing to assert such a claim.

In support of their motion for summary judgment with respect to a claim based on the November 15 conversations with plaintiff Wieger, defendants rely upon Wieger's

deposition testimony in which he acknowledged that neither defendant "told [him] that [he] had to take the site down. They made a request of [him]." (Wieger Dep. at 144) During the first telephone conversation between Wieger and the defendants, Korologos asked if Wieger "could" block access to the site. (Id. at 66) After requesting the removal of the film in their first conversation, neither Metzinger nor Korologos contacted Wieger again. In fact, Wieger called Korologos on his own, stating, "I just wanted to make sure that I was doing what it was that you were asking of me" and asking whether Korologos "would like" him to remove all the files, to which Korologos replied, "Yes." (Id. at 72-73) Defendants have also submitted evidence that they were told by their supervisors that they could lawfully request Wieger's cooperation in removing the film. (Pls. Metzinger 56.1 Resp. ¶¶ 14-15; Pls. Korologos 56.1 Resp. ¶ 15) Government officials may lawfully contact third parties to seek voluntary assistance in preventing the dissemination of messages. Hammerhead, 707 F.2d at 39. In Hammerhead, the court considered whether the defendant administrator had violated the rights of the plaintiff board game manufacturer by urging department stores, without the plaintiff's knowledge, not to carry the game, which defendant believed disparaged the welfare system and welfare recipients. Id. at 36-37. The Second Circuit upheld the district court's dismissal of plaintiff's claim on the basis that the defendant did not have direct control over the department stores, his letter to the stores referred to no adverse consequences, and no stores changed their conduct because of the letters. Id. at 39.

Plaintiffs contend that they have come forward with evidence that a reasonable jury could find that defendants used the threat of legal sanctions or other means of coercion to induce Wieger to block access to Zieper's film, pointing to defendants' authoritative positions and their mention of contact with Zieper and his attorneys. As with Zieper's November 10

allegations, defendants' status as law enforcement officers alone does not create a triable issue of fact as to whether defendants' communications with Wieger were coercive or threatening. Although Wieger asserts that he felt coerced because the defendants told him that the FBI and U.S. Attorney spoke to Zieper, it is undisputed that the defendants only mentioned Zieper and his attorneys in response to a question by Wieger.  Nor does the mere fact that Wieger "did exactly what [defendants] wanted" turn defendants' actions into actionable threats or coercion.  (Pls. Br. at 26)

Plaintiffs also submit evidence, however, that Metzinger told Wieger that they wanted the video blocked because they were concerned that it could be "inciting a riot." (Wieger Dep. at 66)  Defendants, for the limited purposes of this motion, do not dispute that Metzinger used those words in his conversation with Wieger, but assert that this was said in an effort to appeal to Wieger's sense of "good citizenship" by pointing out a public safety concern.  As noted above, numerous cases have found that requests for cooperation that are couched in language referring to criminal conduct may give rise to a First Amendment claim. See, e.g., In re Grand Jury Proceedings, 814 F.2d at 70.  Defendants' reference to their concern that Zieper's video might "incit[e] a riot" does not state (nor necessarily suggest) that they believed Wieger could be guilty of inciting a riot.  Giving plaintiffs the benefit of every reasonable inference on this motion, however, a reasonable jury could find that the statement was coercive, particularly when said by an FBI agent charged with investigating the video.

Plaintiffs submit additional evidence, also undisputed on this motion, that one of the defendants told Wieger, "We've contacted your upstream provider, GTE.  And if you don't pull the site down, they will."  (Wieger Dep. at 157; see also id. at 146)  Wieger asserts that defendants' statements made him feel that non-compliance with their requests would

jeopardize his relationship with GTE, and thereby his web hosting business.  (Id. at 149-51)

Defendants acknowledge that implied threats of economic sanctions can give rise to a First

Amendment claim.  In Rattner, for example, the plaintiff, a director of a local Chamber of

Commerce, wrote an article for its newspaper criticizing local government policies.  The de-

fendant, a village trustee, objected to the plaintiff's message and wrote the other directors of

the Chamber of Commerce stating that such a message was inappropriate.  Rattner, 930 F.2d

at 205-206.  He asked who had been involved in producing the article and other questions

suggesting he wanted to take action against those involved, and compiled a list of forty busi-

nesses with which the defendant regularly dealt.  Id.  The Second Circuit reversed the district

court's grant of summary judgment to the defendants, holding that under these facts a reason-

able person could infer that the defendant was implicitly threatening a boycott.  Id. at 210.

And in Okwedy v. Molinari, a case decided after the events giving rise to this action, the Sec-

ond Circuit found that a complaint had adequately alleged a constitutional violation where it

asserted that the Staten Island Borough President had written a letter to PNE, a lessor of bill-

board space on which plaintiff had posted its arguably protected message.  333 F.3d at 344

(affirming the district court's denial of a 12(b)(6) motion to dismiss).  The Borough President

informed PNE that the anti-homosexual message posted by the plaintiff on PNE's billboards

was "not welcome" in the borough, and that he hoped to "establish a dialogue" on the subject.

Id. at 341-342.  He also referred, however, to the "substantial economic benefits" that PNE

derived from its billboards on Staten Island.  Id. at 342.  The court held that under the circum-

stances, PNE could reasonably infer that, although the Borough President did not have direct

control over third parties, his influence as a result of his status in local government could in-

terfere with PNE's "substantial economic benefits."  Id. at 344.

Plaintiffs contend that like the Borough President's reference to PNE's economic interests, the defendants' reference to Wieger's upstream Internet provider could reasonably be interpreted as coercive. In <u>Okwedy</u>, the letter at issue specifically pointed out that the defendant was aware that the billboard owner derived "substantial economic benefits . . . from its billboards on Staten Island." 333 F.3d at 344. Although there is no evidence in the record before me that either defendant understood what, if any, economic benefits Wieger derived from GTE, drawing every reasonable inference in favor of plaintiffs, a reasonable jury could conclude that the reference to asking GTE to block the website threatened an economic sanction. I conclude that the defendants' interactions with Wieger during the telephone conversations on November 15 present a triable issue of fact on the issue of coercion.

V.  THE APPLICATION OF THE QUALIFIED
    IMMUNITY PRIVILEGE TO THE FACTS

Having concluded that there are triable issues of fact precluding summary judgment in favor of defendants on plaintiffs' claim that they violated the First Amendment, I must consider whether the defendants have established that they are entitled to qualified immunity.

A.  <u>Qualified Immunity Principles</u>

Qualified immunity protects government officials "from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." <u>Lennon v. Miller</u>, 66 F.3d 416, 420 (2d Cir. 1995) (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 817-18 (1982)). It shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." <u>Harlow</u>, 457 U.S. at 818. "While government officials are presumed to have a gen-

eral knowledge of constitutional standards, they are clearly not required to anticipate 'the

manner in which the law's grey areas will be clarified and defined.'" <u>Gill v. DeFrank</u>, 2000

WL 897152, at *2 (S.D.N.Y. Jul. 6, 2000) (citations omitted), <u>aff'd mem.</u>, 8 Fed. Appx. 35

(2d Cir. 2001); <u>accord</u> <u>Wilson v. Layne</u>, 141 F.3d 111, 114 (4th Cir. 1998) (qualified immu-

nity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they

are liable only 'for transgressing bright lines'") (citation omitted), <u>aff'd</u>, 526 U.S. 603 (1999).

Immunity therefore applies to "all but the plainly incompetent or those who knowingly violate

the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986). Because the purpose of qualified im-

munity is to protect government officials from the costs and time of litigation, a question of

qualified immunity should be resolved as early as possible in the proceedings. <u>See</u> <u>Saucier v.</u>

<u>Katz</u>, 533 U.S. 194, 201 (2001) (citing <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)).

      Defendants will be entitled to judgment in their favor on the issue of qualified

immunity if the right violated was not clearly established at the time of the alleged violation,

or there is no genuine dispute of material fact as to "whether . . . a reasonable police officer

should have known he acted unlawfully . . . ." <u>Lennon</u>, 66 F.3d at 421; <u>see also</u> <u>Hope v. Pel-</u>

<u>zer</u>, 536 U.S. 730, 739 (2002); <u>Wilson v. Layne</u>, 526 U.S. 603, 614-15 (1999); <u>X-Men</u>, 196

F.3d at 65-66. If reasonable officials in defendants' positions could disagree as to whether

defendants' conversations and contacts with plaintiffs were unlawful, summary judgment on

the issue of qualified immunity is appropriate. <u>Lennon</u>, 66 F.3d at 421.

      The inquiry into whether a right is clearly established must be made "in light

of the specific context of the case, not as a broad general proposition." <u>Saucier</u>, 533 U.S. at

201; <u>see also</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 639-41 (1987). "The contours of the right

must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right." Anderson, 483 U.S. at 640. This does not mean, however, that an official

will be protected by qualified immunity unless the very act in question has previously been

held unlawful. Id. The unlawfulness must be apparent in light of pre-existing law. Id. De-

fendants contend that the appropriate inquiry is whether it was clearly established in Novem-

ber 1999 that the specific requests made by defendants, made in the way they made them,

would violate the right to be free from coercion. I conclude that such an inquiry would be too

narrow, and conflates the "clearly established" prong of the qualified immunity inquiry with

the "reasonable officer" prong. Even if I were not bound (as I am) by the doctrine of law of

the case, I would nevertheless conclude, as did Judge Berman, that it was clearly established

in November 1999 that a government official violates the First Amendment when he or she,

expressly or impliedly, threatens or coerces a person in an effort to suppress his speech.

Zieper v.Reno, 2002 WL 1380003 at *7 (collecting cases).

With the right as defined above, the next question is whether reasonable law

enforcement officials in defendants' positions could disagree as to whether defendants would

have known that his or her actions violated this right. Lennon, 66 F.3d at 420-21; X-Men,

196 F.3d at 65-66. While the question of whether the actions were coercive or threatening

focuses on what a reasonable listener could have understood, the question of whether defen-

dants are entitled to qualified immunity focuses on what a reasonable speaker—the govern-

mental actor—could have understood. A government official's actions are objectively unrea-

sonable "when no officer of reasonable competence could have made the same choice in simi-

lar circumstances." Lennon, 66 F.3d at 420-21 (citing Malley, supra, 475 U.S. at 341). As

long as a reasonable official could believe that what he or she is doing does not violate an es-

tablished right, qualified immunity protects him or her from suit. <u>Anderson</u>, 483 U.S. at 638 (qualified immunity "shield[s] [defendants] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated"); <u>Malley</u>, 475 U.S. at 341 ("If officers of reasonable competence could disagree on [whether their conduct was illegal], immunity should be recognized."); <u>Hope</u>, 536 U.S. at 739.

Although it is true that "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness," <u>Kerman v. City of New York</u>, 261 F.3d 229, 240 (2d Cir. 2001) (citation omitted), when there is no genuine dispute of material fact, "the ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide," <u>Lennon</u>, 66 F.3d at 421. The Second Circuit has "recognize[d] the apparent anomaly" this creates:

> After all, Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered only when a review of the entire record demonstrates that there is no genuine issue as to any material fact. Disputes over reasonableness are usually fact questions for juries. However, in qualified immunity cases, we are not concerned with the correctness of the defendants' conduct, but rather the "objective reasonableness" of their chosen course of action given the circumstances confronting them at the scene. <u>Id.</u>

Plaintiffs attempt to create a factual dispute on the issue of the reasonableness of defendants' actions by pointing to a dispute as to when various officials knew the video was Zieper's artistic expression, and not an actual plot for the takeover of New York City. (Pls. Mem. at 46-48; Pls. 56.1 Resp. Add'l Facts ¶¶ 10, 13-14, 69) The Court concludes that any such dispute would be immaterial to the question of whether a government official in defendants' positions could find that their statements to Zieper and Wieger were non-coercive. Plaintiffs conceded at oral argument that even "flimsy or nonexistent public safety concerns"

on the part of the government would not render a request to remove the video coercive.  Oral Argument Tr. at 48; <u>see also</u> Letter of Aden Fine dated July [29], 2005.  Although not material to the disposition of this case, the undisputed testimony is that knowledge that the video was Zieper's artistic expression did not remove the public safety concerns on the part of government.  <u>See</u>, <u>e.g.</u>, White Dep. at 55-56; Fitzgerald Dep. at 122-25.  As a result, the fact that defendants may have continued to investigate the video after learning of its origin does not create a triable issue of fact on qualified immunity.

B.    <u>Qualified Immunity with Respect to Metzinger's Contact with Zieper</u>

I conclude that a reasonable officer in defendant Metzinger's position could have believed that nothing in his conversations with Zieper or Zieper's lawyers could intimate "that some form of punishment or adverse regulatory action will follow the failure to accede to [his] request."  (Pls. Mem. at 23 (quoting <u>Rattner</u>, 930 F.2d at 208))  It is undisputed that Metzinger approached Zieper after being told by his supervisors that he could legally request that Zieper remove the film from the Internet.  It is undisputed that his conversation with Zieper was conducted in a facially polite, non-threatening manner.  It is undisputed that he asked only if "there was anyway the FBI could get people to stop seeing the video on the Internet."  (Pls. Metzinger 56.1 Resp. ¶¶ 15-16, 21, 24)  Although it is also undisputed on this motion that Metzinger also asked Zieper "to imagine the consternation the film was causing New York" and that it would have a "negative impact on people's plans and the business interest," (Pls. Metzinger 56.1 Resp. Add'l Facts ¶¶ 24), a reasonable officer could believe that mentioning the possible impact on the public psyche would not lead Zieper (or any reasonable person) to believe they were subject to arrest or other form of punishment.  That something causes "consternation" or has a "negative impact" does not mean that it is illegal or could sub-

ject the person responsible for the "consternation" and "negative impact" to arrest. Whether Zieper subjectively was "terrified" by the experience is not dispositive. It is sufficient that a reasonable officer could readily conclude that nothing Metzinger said intimated to a reasonable listener that punishment would follow if the video was not removed. Because reasonable officers could disagree as to whether the conduct violated a clearly established right, summary judgment in favor of defendants is appropriate. Malley, 475 U.S. at 341.

Plaintiffs argue that Metzinger's admission that he caused the initial call to Zieper to come from the local police officer demonstrates that he knew and understood that people do not take phone calls from federal agents lightly. Any subjective belief on the part of Metzinger, however, is not controlling on the qualified immunity inquiry. See Harlow, 457 U.S. at 815-16; Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 102 (2d Cir. 2003). Nor is it the law that any inquiry from an FBI agent is inherently coercive, and a reasonable special agent of the FBI could conclude that asking a local police officer to make the initial contact did not render that which followed threatening or coercive. Rather, a reasonable officer in Metzinger's position would have been aware that he could request Zieper's cooperation, and that if he did so in a manner that would lead a reasonable person to "feel free to decline the officers' requests or otherwise terminate the encounter" the encounter would not be coercive. Florida v. Bostick, 501 U.S. 429, 436 (1991) (applying test in Fourth Amendment case). In this case, Zieper declined Metzinger's requests, and terminated the conversation.

The court also concludes that a reasonable officer in Metzinger's position would not view anything Metzinger said during the call placed to him by Zieper's lawyers as intimating that Zieper would be punished if he did not remove his film from the Internet. Even Zieper's lawyer agreed that Metzinger's answer (it was "not over") to the lawyer's ques-

tion of whether the investigation would continue was the expected answer, and that if Metz-
inger had said the investigation was over, such an answer would have been "contrary to [the
lawyer's] 20 years of experience with the FBI." (Thompson Dep. at 31-33) Certainly, then, a
reasonable officer in Metzinger's position could have believed that it was merely informative,
and not coercive, to state that the investigation was not over.

C.     Qualified Immunity with Respect to Defendants' Contacts with Wieger

  Turning to defendants' conversations with Wieger, the inquiry is whether a
reasonable officer in defendants' position could have believed that those conversations consti-
tuted threats. Wieger testified that his only contact with defendants was during two telephone
conversations on November 15, 1999. During the first, initiated by defendants, defendants
introduced themselves and told him "where they were from" and "[a]sked [Wieger] if [he]
was the owner of crowdedtheater.com." (Wieger Dep. 64) Wieger told them he was not, and
asked why they were inquiring. (Id.) Metzinger then explained who he was, and that "he
was . . . handling riot control or something along those lines; and started describing the film to
[Wieger], telling [Wieger] what it was, what the bad things were about it . . . . [and that] they
were trying to get the tape offline, the site offline, so that people would no longer see it." (Id.
at 64-65) When Wieger suggested that they get in touch with the site's owner, Metzinger in-
formed him that "we know Michael Zieper . . . [and] have already been in contact with his
lawyers.'" (Id. at 65) According to Wieger, Korologos then "took the conversation over and
said, 'What can we do to get people to stop seeing this?'" Wieger informed her that he could
"either take the site offline, or [] pull the content," and "asked them what it was that they
wanted me to do." (Id. at 66) Wieger believes Metzinger "also mentioned . . . that they
thought it was inciting a riot." (Id.) Wieger then asked Korologos "how they wanted me to

proceed?" (Id.) At some point in the conversation, Wieger asked defendants, "Am I in trouble?" Although plaintiffs assert that he received no response to his question, Wieger testified at deposition that he could not recall whether he received a response or not. (Id. at 71) When Korologos asked him if he could block access to the website, Wieger told her that he could, and "while I was on the phone with them, I did so. I blocked access to the front page. Lisa said, 'Thank you,' and would this stop people from seeing the – being able to get to the site? "I said, 'Yes.' She thanked me. I believe that was the end of the conversation until I called back." (Wieger Dep. at 65-67; see also id. at 68-70)

Despite telling Wieger that "they had contacted [his] upstream provider, GTE, and if [he] didn't take it down, they would" (Wieger Dep. at 146), defendants did not tell him what they had told GTE "other than if [he] didn't remove the content, that the upstream provider would." (Id. at 147; see also id. at 157) Wieger may have believed that if GTE pulled the site, OLM "would have dropped [him] like a hot potato" (Wieger Dep. at 149), but his subjective beliefs are not controlling on the issue of qualified immunity. Although immaterial to qualified immunity, Wieger also testified that he never had any contact with anyone at GTE, and he never asked the FBI or the U.S. Attorney's office not to contact GTE or OLM. (Id. at 153, 156) Indeed, Wieger testified that knowing GTE would pull the website if he did not had nothing to do with his decision to block access to the website. (Id. at 159)

About 30 minutes after the only telephone call either defendant placed to Wieger, Wieger called Korologos at the number she had given him. (Wieger Dep. at 71-72) He believes the phone was answered "U.S. Attorney's Office," and he was connected to Korologos when he asked for her extension. (Id. at 72) He explained who he was, and said "I just wanted to make sure that I was doing what it was that you were asking of me." (Id.)

When Korologos asked if people could still see the site, Wieger told her that anyone with any Internet knowledge could still access the files, and explained how someone could do that. (Id.)  When Korologos then asked Wieger how they could stop seeing the site altogether, Wieger told her that "the only way to do that is to remove all the files" and asked her if that was what she would like him to do.  (Id. at 73)  When she answered "Yes," Wieger removed all the files, which he testified "only takes a second."  (Id. at 74)  Wieger testified that during the second conversation, "after Lisa asked me to delete the files, . . . I said, 'Well, we should contact Mr. Zieper and let him know," and Korologos told him "that was not necessary."  (Id. at 144)  At no time during the two brief phone calls did defendants tell Wieger that he was under investigation or "that there was any danger or possibility that [he] was going to be ar- rested or charged."  (Id. at 160)

Within a day or two of his conversations with defendants, Wieger contacted OLM, and asked them if anyone from the U.S. Attorney's Office or the FBI had contacted them asking to have the site pulled down.  (Wieger Dep. at 90-91)  OLM told Wieger that did not happen.  (Id.)  OLM did not ask him to remove content, although Wieger sent an e-mail to Zieper telling Zieper that OLM had asked him to do so.  Indeed, OLM told Wieger that he "could put the site back up."  (Id. at 92-93; see also id. at 78)

It is undisputed that defendants contacted both Zieper and Wieger with the knowledge and approval of their supervisors.  (Korologos Dep. at 68-69; Pls. Korologos 56.1 Resp. ¶ 15; Pls. Metzinger 56.1 Resp. ¶¶ 12-16)  Acting under the advice or order of a supe- rior does not ipso facto immunize officers from suit.  See Diamondstone v. Macaluso, 148 F.3d 113, 126 (2d Cir. 1998) (officer who continued to ticket an individual after traffic court repeatedly determined that there was not sufficient cause was not protected by qualified im-

munity even though he was following the advice and orders of his superiors). The Second

Circuit has recognized that it can be reasonable for an officer to engage in conduct that later is

found unconstitutional when that officer acts under the direction of supervisors. <u>Anthony v.

City of New York</u>, 339 F.3d 129, 130 (2d Cir. 2003) ("Plausible instructions from a superior

or fellow officer support qualified immunity where, viewed objectively in light of the sur-

rounding circumstances, they could lead a reasonable officer to conclude that the necessary

legal justification for his actions exists (<u>e.g.</u> a warrant, probable cause, exigent circum-

stances).") (citations omitted).

      In <u>Lauro v. Charles</u>, 219 F.3d 202, 204-05 (2d Cir. 2000), the defendant police

officer took plaintiff on a staged "perp walk" to accommodate the press, which wanted foot-

age of the plaintiff being arrested. The Second Circuit found such "perp walks" unconstitu-

tional, but determined that the police officer was protected by qualified immunity where the

evidence showed, <u>inter alia</u>, that defendant was acting under the direction of his supervisors.

<u>Id</u>. at 203, 216 n.10 (reversing the district court's denial of defendant's motion for summary

judgment on qualified immunity). In <u>Washington Square Post No. 1212 American Legion v.

Maduro</u>, 907 F.2d 1288, 1290 (2d Cir. 1990), FBI agents entered a commercial establishment

that they mistakenly believed to be open to the public without a search warrant. The agents

believed from experience that such clubs were open to the public, and were instructed by their

superiors that a warrant was unnecessary. <u>Id</u>. at 1292-93. The Second Circuit held that the

agents were "entitled to rely on the reasonable instructions of their superior in the chain of

command, particularly where those instructions were not inconsistent with their personal

knowledge and experience," and it was therefore reasonable for the officers to believe that

their conduct was lawful. <u>Id</u>. at 1293.

In this case, AUSA Fitzgerald of the USAO-SDNY's Organized Crime Terror-
ism Unit informed Special Agent D'Amuro of the Counterterrorism Branch of the FBI's New
York Office that government agents could request, but not threaten or coerce, a person to
block access to Zieper's video. (D'Amuro Dep. at 7; Pls. Metzinger 56.1 Resp. ¶ 15)
D'Amuro passed on this instruction to Metzinger or his supervisor. (Pls. Metzinger 56.1
Resp. ¶ 16) U.S. Attorney Mary Jo White also informed AUSA Garcia that government
agents could request that Wieger remove the film as part of the FBI's "good corporate citizen-
ship program." (White Dep. at 5) This information was communicated to AUSA Korologos.
(Korologos Dep. at 68-69) Viewing the facts in a light most favorable to plaintiffs, I conclude
that a reasonable officer standing in the shoes of Metzinger and Korologos could believe that
he or she was complying with the instructions of their supervisors and the law, and not threat-
ening or coercing Wieger.

At the time of the conversations with Wieger, a reasonable officer would have
had reason to know that using implied economic threats, such as gathering information for a
possible boycott, was impermissible. See Rattner, 930 F.2d at 210. But a reasonable officer
would also have known that he or she could ask third parties, even those with control over
distribution of the plaintiff's message, for voluntary cooperation in preventing access to a
third-party's speech, even if that may result in the loss of some economic benefit. See Ham-
merhead, 707 F.2d at 39; R.C. Maxwell Co. v. Borough of New Hope, 735 F.2d 85, 86 (3d
Cir. 1984).[8] Here, too, Wieger testified that defendants' statements concerning GTE were not
the reason he blocked access to Zieper's website. (Wieger Dep. at 159) Although Wieger
asserts that any request to GTE to block access to Zieper's website would cause him to lose

---

[8]    The Second Circuit's 2003 decision in Okwedy, on which plaintiffs place considerable reliance, had not
       been decided as of November 1999, and cannot reflect what a reasonable officer in defendants' position
       should have known was conduct violating the "clearly established law" as of that time.

his business (id. at 149), there is no evidence that defendants knew that such a request would

have a negative effect on Wieger's business (even assuming it is true).  In fact, the undisputed

evidence is that Wieger has testified that defendants told them they had already contacted

GTE (Wieger Dep. at 157), and plaintiffs assert that "[i]n the case of an Internet web host,

such as Wieger, the amount of income derived from each individual speaker who has a web

site is a [ ] small[] fraction of the provider's total income . . . ." (Pls. Mem. at 33).  The refer-

ence to GTE was not such that any reasonable officer would view it as threatening or coer-

cive.  An officer of reasonable competence intending to follow the law could have made the

same choices as Metzinger and Korologos under the same or similar circumstances.

Defendants are entitled to summary judgment on the issue of qualified immu-

nity with respect to plaintiffs' First Amendment claim.[9]

---

[9]    Plaintiffs also assert procedural and substantive due process claims, alleging that defendants violated their rights under the Fifth Amendment "because defendants suppressed plaintiffs' speech without any judicial determination that the speech is unprotected by law."  (Complaint ¶ 78)  Without determining the extent, if any, to which any such due process claims are subsumed in a First Amendment claim, I conclude that because reasonable officers in defendants' positions could believe that their contacts with plaintiffs were legally permissible attempts to convince, and not attempts to coerce, it follows that such an officer could also conclude that no prior judicial approval was required before informally requesting the removal of Zieper's video.  Defendants therefore are entitled to qualified immunity with respect to plaintiffs' Fifth Amendment due process claims as well.

## VI.   CONCLUSION

For the reasons set forth herein, defendants' motion for summary judgment dismissing plaintiffs' complaint is GRANTED.  The Clerk is directed to enter judgment in favor of the defendants.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 22, 2005